UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LONNIE L. PARKER,

                Petitioner,                    Case No. 1:11-cv-1297

v.                                      Honorable Janet T. Neff

SHERRY BURT,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Muskegon County Circuit Court, Petitioner was convicted of assault with intent to commit great bodily harm less than murder, MICH. COMP. LAWS § 750.84, and unarmed robbery, MICH. COMP. LAWS § 750.530. On January 30, 2009, Petitioner was sentenced as a fourth felony offender, MICH. COMP. LAWS § 769.12, to respective prison terms of 9 to 25 years and 15 to 25 years. In his *pro se* petition, Petitioner raises fifteen grounds for relief, as follows:

    I.       VIOLATION OF [PETITIONER'S] U.S. CONST. PROTECTED 5TH AND 14TH AMENDMENT RIGHT TO DUE PROCESS. PRO PER [PETITIONER] WAS CHARGED WITH "ASS. GBH" GOING INTO "PRELIM" 30+ DAYS AFTER ARREST. UNKNOWN TO [PETITIONER] THE STATE WAS SEEKING ROBBERY CHARGES AND ADDED SUCH AT END OF PRELIM. [PETITIONER] COULDN'T PREPARE ON ZERO NOTICE, CALL ANY WITNESS OR EVEN QUESTION THE STATE'S WITNESS (PER THE COURT) ON THE ISSUE OF ADDED ROBBERY COUNT; WHICH COULD HAVE PREVENTED A BIND OVER.

    II.      VIOLATION OF [PETITIONER'S] 6TH AMENDMENT RIGHT TO REPRESENT HIMSELF. [PETITIONER] WAS HAVING COMMUN-

ICATION, STRATEGIC, AND PERSONAL PROBLEMS WITH HIS RETAINED COUNSEL AND WROTE THE COURTS CLEARLY EXPRESSING HIS DESIRE TO REPRESENT HIMSELF IN TRIAL. [PETITIONER] WAS DENIED AND FORCED INTO TRIAL WITH COUNSEL WHOM ALSO WANTED OFF OF CASE.

III. VIOLATION OF [PETITIONER'S] 6 AM CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. COUNSEL FAILED TO PREPARE BY FAILING TO INTERVIEW ANY DEFENSE OR STATE WITNESS PRIOR TO TRIAL, IN ADDITION FAILED TO PROPERLY EXPLAIN [PETITIONER'S] GUIDELINES WHEN COUNSEL ERRONEOUSLY SHOWED [PETITIONER] WHERE HE COULD ONLY RECEIVE LESS TIME THAN HE ACTUALLY RECEIVED AT SENTENCE.

IV. VIOLATION OF [PETITIONER'S] 6[TH] AMENDMENT RIGHT TO CONFRONT.  THE DEFENSE WAS PREVENTED FROM PROVING THE VICTIM WAS ON DRUGS AT THE TIME IN QUESTION.  THE COURT WOULD NOT ALLOW THE DEFENSE TO QUESTION ON ANY ISSUE OF DRUG USE, POSSESSION OR SALE BY THE VICTIM.

V. VIOLATION OF [PETITIONER'S] 5TH AND 14TH AMENDMENT RIGHT TO DUE PROCESS. THE PROSECUTION MADE STATEMENT TO THE JURY IN THEIR CLOSE, THAT THE DEFENSE WAS TRYING TO TRICK THE JURY; TRYING TO SHAM OR FLIM-FLAM THEM.

VI. VIOLATION OF [PETITIONER'S] 5TH AND 14TH AM RIGHT TO DUE PROCESS.   THE STATE SENTENCED [PETITIONER] ON IN-ACCURATE INFO, RECORD EVIDENCE SHOWS VICTIM WAS PUSHED A FEW FEET AND ASSAULTED, OUTSIDE ON A MAJOR CORNER WHERE MORE PEOPLE COULD VIEW [PETITIONER'S] ACTIONS WHILE STILL IN VIEW OF STORE WITNESS VIA GLASS DOOR. THE STATE'S OV 8 SCORE WAS WRONGLY APPLIED.

VII. VIOLATION OF [PETITIONER'S] 5TH AND 14TH AM RIGHT TO DUE PROCESS. THE STATE REFUSED DEFENSE REQUEST FOR NEW TRIAL AND AN EVIDENTIARY HEARING. [PETITIONER] ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTION MISCONDUCT WHERE PROSECUTION WITNESS MADE AFFIDAVIT ALLEGING SHE WAS PRESSURED TO TESTIFY A WAY FAVORABLE TO THE STATE AND THAT THE STATE WAS HOLDING PENDING CHARGES OVER THEIR HEADS.

VIII.    VIOLATION OF [PETITIONER'S] DUE PROCESS RIGHTS 5TH AND 14TH AMENDMENT. THE PROSECUTION REFERRED MANY TIMES TO THE JURY THAT [PETITIONER] COULD HAVE OR SHOULD HAVE BROKEN HIS RIGHT TO SILENCE AND COME CLEAN WITH POLICE.

IX.    VIOLATION OF [PETITIONER'S] 6[TH] AMENDMENT RIGHT TO CONFRONT. THE VICTIM TESTIFIED HE WAS TOLD [PETITIONER] ROBBED HIM. DEFENSE COUNSEL FAILED TO OBJECT TO THIS OBVIOUS HEARSAY TESTIMONY. THERE WAS NO OTHER WITNESS TESTIMONY ALLEGING SUCH.  THE DEFENSE IN NO WAY COULD CONFRONT THIS STATEMENT OR THESE PEOPLE AS THEIR IDENTITY IS UNKNOWN.

X.    VIOLATION OF [PETITIONER'S] 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. [PETITIONER] WAS ALLOWED TO FILE PRO PER MOTIONS IN TRIAL COURT VIA HIS ATTORNEY. COUNSEL WAS THEN GIVEN SEVERAL MOTIONS BY [PETITIONER] WEEKS BEFORE TRIAL.  COUNSEL RESPONDED BY REPETITIOUSLY FILING ONE MOTION AND UNTIMELY FILING OTHER MOTION (ON DAY OF TRIAL) WHICH IS WHY MEDICAL RECORDS MOTION WAS DENIED.

XI.    VIOLATION OF [PETITIONER'S] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE 6TH AMENDMENT.  SEVERAL PROSE-CUTION WITNESSES HAD PENDING CRIMINAL CHARGES BEFORE SAID PROSECUTION[']S OFFICE AND DEFENSE COUNSEL REFUSED TO IMPEACH OR QUESTION THESE WITNESSES BEFORE THE JURY ON POTENTIAL BIAS, FEAR OR DEALS.

XII.    VIOLATION OF [PETITIONER'S] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE 6[TH] AMENDMENT.  DEFENSE COUNSEL ALLOWED VICTIM TO TESTIFY FALSELY WHEN THE VICTIM TESTIFIED HE MAY HAVE WATCHED WITNESS MS. CUNNINGHAM'S CHILDREN ONCE OR TWICE. DEFENSE COUNSEL KNEW AND HAD STATE DOCUMENTATION THAT VICTIM WAS PAID BI-WEEKLY FOR BEING SAID CHILDREN'S (STATE HIRED) DAILY CHILD CARE PROVIDER (FOR YEARS) AND COUNSEL REFUSED TO IMPEACH.

XIII.    VIOLATION OF [PETITIONER'S] 5TH AND 14TH AMENDMENT RIGHTS TO DUE PROCESS.  THE COURT ALLOWED CLASS OF 11 OR 12 YEAR OLDS TO SIT IN ON JURY TRIAL WHICH GRA[PH]IC

PHOTOS AND EVIDENCE WERE SHOWN. THESE CHILDREN CAPTURED THE [PETITIONER'S] AND JURY'S ATTENTION SEVERAL TIMES WITH THEIR PRESENCE AND FAINT REACTIONS TO SUCH EVIDENCE.

XIV.   VIOLATION OF [PETITIONER'S] RIGHT TO ACCESS THE COURTS UNDER THE 1ST AMENDMENT.   PETITIONER WAS DENIED ACCESS TO LEGAL MATERIALS AND ANY FORM OF RESEARCH THAT WOULD ALLOW HIM TO PREPARE FOR TRIAL.  MUSKEGON COUNTY HAS LAW LIBRARIES AND UNLIKE OTHER COUNTY'S [SIC] THEY REFUSE DEFENDANTS FROM ACCESS TO IT OR MATERIALS FROM IT, TO AID IN A DEFENDANT[']S ABILITY TO EFFECTIVELY HELP IN HIS DEFENSE.

XV.   VIOLATION OF [PETITIONER'S] 6[TH] AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. [PETITIONER'S] COUNSEL EXPRESSED MANY TIMES HIS LOYALTY WAS WITH MUSKEGON COUNTY WHOM HE FORMALLY REPRESENTED.  COUNSEL ALSO EXPRESSED HIS RELUCTANCE TO FILE ANY MOTION OR DO ANYTHING ON CLIENT'S BEHALF THAT MAY INCONVENIENCE THE COURT OR CAUSE THE JUDGE TO HAVE TO "WORK." HE MENTIONED HE AND THE JUDGE WERE GOOD PERSONAL FRIENDS AND IN FACT THE JUDGE HAD EVEN ONCE WORKED FOR HIM.

(Pet., docket #1, Page ID##4-31.)  Respondent has filed an answer to the petition (docket #11) stating that the grounds should be denied because they are non-cognizable, procedurally defaulted, and/or without merit.  Upon review and applying the AEDPA standards, I find that all of the grounds are either procedurally defaulted, non-cognizable, or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from Petitioner striking his cousin, Darin Sargent, with sufficient force to break Sargent's jaw and to cause him to fall to the pavement, resulting in a head

injury.  Petitioner was charged with assault with intent to cause great bodily harm less than murder.

A preliminary examination was held on July 2, 2008, at which time Petitioner dismissed his retained

attorney, Joseph Fisher, and represented himself.  (7/2/08 Prelim. Exam. Tr. at 5, docket #14.) After

the evidence was introduced, the prosecutor moved to add a count of unarmed robbery.  (*Id.* at 37.)

Petitioner was bound over on both charges.  (*Id.* at 42.)

   On July 25, 2008, Christopher Wilson was appointed to represent Petitioner.  (Case

Register, docket #13 at 2.)  Four days later, on July 29, 2008, Petitioner's family retained Al E.

Swanson as Petitioner's attorney to replace Mr. Wilson.  (*Id.*)  On August 18, 2008, the court held

a *Cobbs* hearing[1] on a possible plea agreement, but no plea ultimately was entered.  On September

30, 2008, attorney Swanson moved to withdraw as counsel, due to a breakdown in the attorney-client

relationship and Petitioner's desire to hire a different attorney.  The motion was heard on October

2, 2008, two weeks before trial was scheduled to begin.  Under the circumstances and with the

prosecutor's consent, the motion was granted.  (10/2/08 Mot. Hr'g Tr., docket #17.)  Petitioner then

retained attorney Steven Corwin on October 20, 2008.  (*Id.*)  On December 22, 2008, just over two

weeks before trial, the Court held a hearing on attorney Corwin's request to withdraw as counsel and

to permit Petitioner to represent himself.  (12/22/08 Mot. Hr'g Tr., docket #16.)  The motion was

denied on the grounds that Petitioner had not expressed an unequivocal intention to withdraw within

the standard established in *People v. Anderson*, 247 N.W.2d 857 (Mich. 1976).

---

[1]*People v. Cobbs*, 505 N.W.2d 208 (1993) (holding that, where a judge preliminarily agrees to a particular sentence as the basis for a defendant's entry of a plea, the defendant must be given an opportunity to withdraw his plea if the subsequent sentence exceeds the preliminary evaluation).

Petitioner was tried before a jury beginning January 6, 2009 and ending January 8, 2009.[2] On the morning of first day of trial, the court also heard the prosecutor's motion in limine to bar testimony concerning the victim's prior behavior leading up to the assault, contending that it was irrelevant to the charges and amounted to a request for jury nullification. (Tr. I at 3-4.) Defense counsel responded that the evidence concerning the background and relationship between Petitioner and the victim was critical to show that Petitioner did not have the intent to do great bodily harm and did not commit the robbery. Instead, the evidence would show that Petitioner and the victim were cousins and friends who had previously had other altercations and that Petitioner intended only to teach his cousin a lesson. Absent evidence of the background, the defense would be left without an ability to offer an explanation for Petitioner's behavior that allowed the jury to understand how Petitioner had hit the victim so hard as to cause major injury without intending the consequences. Counsel believed that, in context, the jury reasonably could find Petitioner guilty of a lesser assault offense. (*Id.* at 6-8.)

The court also addressed a defense motion to preclude the introduction of evidence of the head injury and a motion to dismiss the unarmed-robbery charge added at the preliminary examination, both of which the court denied. (*Id.* at 15-22.) In addition, the trial court fully described the *Cobbs* agreement, which remained on offer to Petitioner on the first day of trial. Under the agreement, Petitioner would be given a minimum sentence of 108 months on the higher, unarmed-robbery charge as a fourth felony offender, for which the maximum was life imprisonment.

---

[2]References to the trial transcripts will hereafter be identified as follows:

January 6, 2009 (docket #19):  Tr. I at ____.
January 7, 2009 (docket #20):  Tr. II at ____.
January 8, 2009 (docket #21):  Tr. III at ____.

(*Id.* at 22-28.)  Following a break to consult with his attorney, Petitioner rejected the offer.  (*Id.* at 28.)

Darin Sargent testified that Petitioner is his cousin, who is about the same age (approximately 38), but substantially bigger, taller and heavier than Sargent.  (*Id.* at 145, 154, 163.)  On May 13, 2008, Sargent got a call from his friend, Black, to come over to a barbecue and play cards.  (*Id.* at 145, 163.)  Carma Cunningham, Petitioner's former girlfriend, lived in the house, and Sargent initially did not feel right about being there, but Cunningham told Sargent that she was no longer involved with Petitioner.  (*Id.* at 145, 164.)  Sargent met Cunningham through Petitioner, but, after Petitioner's relationship with her ended, Sargent still remained friends with Cunningham.  After eating, Sargent and others were sitting on the porch when Petitioner pulled up across the street.  Sargent went over to talk with Petitioner.  (*Id.* at 146-47, 166.)  Petitioner said, "[S]o you go over my ex house."  (*Id.* at 147.)  Sargent responded that he was at the house, but he had come over at Black's invitation for the barbecue and to relax.  (*Id.*)  Petitioner told Sargent that he was not with Cunningham any longer, and Sargent told Petitioner that Petitioner's relationships did not concern Sargent.  After the two talked, Petitioner drove away and Sargent went back up on the porch.  Cunningham then asked Sargent for a cigarette, but he had only a couple left.  He offered to take her to the store so that she could get some cigarettes and he could get some beer.  (*Id.* at 147-49, 166.)  Sargent and Cunningham drove to the store, where Sargent got a 22-ounce beer.  While Sargent was asking the clerk for some cigarettes, Petitioner came up behind him, saying, "[Y]o cuz, come here, let me holler at you."  (*Id.* at 150.)  Sargent asked him to wait a moment while he finished paying for his purchases.  Petitioner told him that he needed to talk with him immediately, and pushed him out the door.  Sargent assumed that something was going on with his car, as he had left it running

outside. (*Id.*) After Petitioner pushed him out the door, Sargent looked at his car, and his next memory was waking up at the hospital. He did not remember being hit. (*Id.* at 150-51.) At the time of the incident, Sargent had $180.00 in his pocket and a diamond stud in his ear. (*Id.* at 150, 169-70, 177.)

Sargent had to hold his jaw when he was talking to hospital personnel, because it was broken and shifted out of alignment. It hurt a great deal. He subsequently had surgery and had his jaw wired shut for eight weeks. (*Id.* at 152.) During that time, he could not eat solid foods and was in the hospital. (*Id.* at 161.) At the time of trial, he still could not eat certain foods, his jaw ached in the morning, and, because he had numbness in part of his jaw, spittle sometimes ran down the side of his jaw. He continued to have a steel plate in place, which was positioned from one side of his jaw to the other. (*Id.* at 152-54.)

Sargent identified himself, Cunningham, Petitioner, and Ken Shepard on a video made inside Hackley Liquor on the date of the incident, showing Petitioner come behind Sargent and push him out the door. (*Id.* at 155-57.) He then identified himself and Petitioner on a video taken on the outside of the store, which, according to Sargent, showed Petitioner pushing Sargent, hitting him, taking Sargent's money out of his pocket, and then walking away. The video then showed Sargent trying to get up, but Sergeant had no memory of that. The video also showed Cunningham leading him to the car. (*Id.* at 159-60.) According to the video, Sargent had no opportunity to defend himself. Sargent testified that he did not even know that Petitioner was angry, or he would have tried his best to stay in the store. (*Id.* at 161.) Sargent acknowledged that he did not initially tell the investigating officers that he had lost $180.00 during the incident. (*Id.* at 173-74, 179, 186.) He stated that he did not realize the money was gone until after he had been at the hospital for some

time.  (*Id.* at 150, 168-70, 174.)  Sargent testified that he also lost his diamond earring during the incident.  (*Id.* at 177-78.)

Kenneth Shepard testified that he was a close friend of Petitioner and that he knew Darin Sargent and Carma Cunningham.  (*Id.* at 202.)  On the date of the incident, Petitioner was no longer dating Cunningham, but was instead dating Shepard's sister, Keisha.  Keisha's house was across the street from Cunningham's house.  (*Id.* at 203.)  On May 13, 2008, Petitioner stopped by Shepard's father's house, where Shepard was sitting and drinking a beer.  Petitioner talked to Shepard and his father, saying that he was going home to wash his car, and Shepard asked if he could go with him.  Petitioner refused at first, but Shepard got into the car anyway, and they left.  They washed the car, changed their clothes, and then went driving.  As they drove to the Hackley Liquor Store, Petitioner noticed Sargent in the store.  Petitioner told Shepard, "I need to holler at him."  (*Id.* at 204.)  Shepard had no idea that there was going to be trouble when he and Petitioner went into the store.  Petitioner went up to Sargent, saying, "[C]an I holler at you."  (*Id.* at 205.)  When Sargent asked Petitioner to wait, Petitioner replied, "[N]o I need to holler at you."  (*Id.*)  Petitioner then pushed Sargent out of the store.  (*Id.*)  Shepard still did not expect violence as he followed Petitioner and Sargent out of the store.  Shepard saw Sargent fall to the ground and saw Petitioner hit Sargent multiple times in the face.  Sargent at no time fought back, nor was he able to do so.  (*Id.* at 206-08.)  After Petitioner stopped, Sargent looked dazed.  (*Id.* at 207.)  After the fight, Shepard saw Petitioner with cigarettes cupped in his hand, but he never saw Petitioner with money.  (*Id.* at 208.)  Shepard was scared, shocked and puzzled by the sudden attack.  (*Id.* at 212.)  Shepard observed Petitioner patting down Sargent and checking Sargent's waist.  He did not see Petitioner reach into Shepard's pockets, nor did he see anything fall to the ground.  (*Id.* at 214-16.)  After patting Sargent down,

Petitioner stood and said, "[C]ome on." (*Id.* at 215.) When they got to the car, Shepard asked Petitioner for a cigarette. Petitioner gave him one and then immediately dropped him off. (*Id.* at 216.)

Former Muskegon Heights Police Officer Chris Stoddard testified that he was called about a reported fight at the Hackley Liquor Store, but when he arrived, no fight was ongoing and none of the six to twelve people standing around would provide him any details. (*Id.* at 220, 225-26.) One person, John Banks, told Stoddard that he believed that Lonnie Parker had hit Darin Sargent. (*Id.* at 226-27, 232.) The store cashier told Stoddard that he could not access the videotape and that Stoddard would have to try to get it the next day. (*Id.* at 226, 232.) Half an hour later, Stoddard was called to Hackley Hospital. He saw Sargent lying in a hospital bed with an extremely swollen face, a misaligned jaw, and blood coming out of his mouth. (*Id.* at 220-21.) Knowing that Sargent's jaw was broken, Stoddard got a pad of paper for Sargent to use to write his answers to questions. (*Id.* at 221.) Sargent identified who had hit him. (*Id.* at 223.) Stoddard also took pictures, which he identified for the jury. (*Id.* at 221-23.) Later that evening, Sargent told Stoddard that some money had been taken from him. (*Id.* at 230-31.)

John Walker testified that he arrived at the Hackley Liquor Store just as the fight had ended. (*Id.* at 234-35.) He saw Carma Cunningham help Sargent get up, and he went over to help her get Sargent to the car. (*Id.* at 235.) Walker asked Cunningham if she was taking Sargent to the hospital, and she said yes. Sargent's face and mouth were swollen, some bottom teeth were missing, and blood was coming out of his mouth. (*Id.*) Walker did not see Petitioner that day, and he did not see anyone going through Sargent's pockets or picking up money. (*Id.* at 236.) Walker spoke with

an officer who arrived as Walker was going into the store.  Walker had no idea why the officer might have recorded his name as "John Banks."  (*Id.* at 238.)

After the jury had been excused for the day, the court again heard argument on the admissibility of evidence about the good relationship between the victim and Petitioner and about Petitioner's concern about Sargent being around Cunningham, because Sargent was involved in drugs. (*Id.* at 244-45.)  Petitioner's theory of the case was that the injury was a result of anger and Petitioner's a desire to send a message, not an intent to seriously injure, and the assault was not part of a robbery.  (*Id.* at 244-46.)  Defense counsel argued that Petitioner needed to be able to explain why he hit Sargent and the nature of their relationship in order to demonstrate that he lacked the intent to commit great bodily harm less than murder.  (*Id.* at 249-50.)  The following morning, the court ruled that Petitioner could explain why he hit Sargent only to the extent that he did not believe that it was good for Ms. Cunningham to hang out with Sargent, but he could not say that Sargent was involved with drugs.  (Tr. II at 7-8.)  In addition, the court denied on the grounds of relevance and the risk of confusion a hand-written motion filed by Petitioner for discovery of the toxicology reports on Sargent.  (*Id.* at 11-12.)

Dr. James Spoto testified as an expert in ear, nose, throat and facial plastic surgery. (*Id.* at 17.)  Spoto was called by a Hackley Hospital emergency physician on May 13, 2008, regarding a young man with an obvious jaw fracture.  (*Id.*)  Spoto went to the hospital and observed an open jaw fracture, where the mucous membrane was broken and the bone stuck out.  The fracture was at about the midline, through the mandible, and the jaw was mal-rotated due to the pull of muscles.  He ordered a CAT scan to discover other fractures that were not immediately apparent, and he found a total of two: one in the upper part of the jaw and one in the neck area of the jaw.  (*Id.* at

18-19).  Spoto determined that early surgery was needed to put a permanent titanium plate over the main fracture.  He also attempted to put a plate over the upper fracture, but he could not do so because the fracture was too high and put the facial nerve at too much risk.  So they wired Sargent's jaw shut to let the upper fracture heal.  (*Id.* at 21.)  According to Spoto, it takes about 2000 pounds of pressure to fracture a jaw, which is considerable force, but it can easily be delivered by a single blow from a fist.  (*Id.* at 24-26.)  He acknowledged, however, that most blows with a fist do not break the jaw.  (*Id.*)

Carma Cunningham testified that she had previously been in a relationship with Petitioner for five years, but the relationship was over by May 13, 2008.  (*Id.* at 28, 38.)  She denied ever having a romantic relationship with Sargent.  On the day of the incident, she had been at a friend's house (Asmonte Black's house), and Sargent gave her a ride to the store.  (*Id.* at 28-29, 34.)  She went to the cooler and then walked back up to the counter, where Sargent already was standing.  She saw Petitioner and Sargent briefly, but by the time she reached the counter, they were leaving the store.  (*Id.* at 29.)  She did not see what happened outside the store.  When she left the store, she saw Sargent on the ground, trying to get up.  She did not see Petitioner.  She had been drinking, and she did not know what was going on.  (*Id.* at 30.)  Cunningham saw that Sargent was bleeding, and she focused on trying to help him to get to the hospital.  Others helped her get Sargent to the car, and she asked some people to search Sargent's pockets to find his keys.  (*Id.* at 31, 35-36.)  She drove him to Hackley Emergency, but she stayed only until she was sure he would be seen.  (*Id.* at 32.)  Cunningham testified that the situation was confusing, and a couple of people were searching Sargent's pockets.  She assumed that Sargent had money, as did she, but she did not know what happened to any money, including her own.  (*Id.* at 36-37.)

- 12 -

Muskegon Heights Detective Stephen Clark testified that he was assigned to take over the investigation of the case. (*Id.* at 39-40.) He met with Kevin at the liquor store to retrieve videotapes taken from two different camera angles. (*Id.* at 40.) After giving Petitioner his *Miranda* warnings, Clark interviewed Petitioner. Petitioner acknowledged being Sargent's cousin, but he initially denied any knowledge of the incident. (*Id.* at 42-43.) Petitioner, however, acknowledged seeing Sargent at the Hackley Liquor Store. Petitioner then asked to see the police report before answering any questions about the fight, but Clark denied the request. (*Id.* at 43-44.) Petitioner refused to describe anything that happened and eventually told Clark that he wanted a lawyer. (*Id.* at 44-45.) When he was later recalled to the stand, Clark indicated that Petitioner's witnesses, Marie Parker and Michael Mosley, never called him to report their conversations with Sargent. (*Id.* at 111.)

Because of problems with certain prosecution witnesses, the defense began its case before the prosecution rested. Petitioner testified that Sargent was his cousin, they had worked together at the Veterans of Foreign War nightclub, and they socialized together periodically. (*Id.* at 58.) About 30 days before the incident, Petitioner had participated in some telephone calls with Sargent about Ms. Cunningham. (*Id.* at 59.) In addition, about 15 to 20 minutes before the fight, Petitioner had spoken with Sargent on Wood Street. (*Id.* at 60-61.) Sargent had stopped taking Petitioner's calls, and Petitioner was concerned about a couple of incidents in which Sargent was involved. (*Id.* at 61.) Sargent became offended. (*Id.* at 62.) Petitioner tried to explain the content of the conversation, but he was not allowed to do so. (*Id.*) Petitioner then explained that he had become angry, too, because he was concerned that Sargent was a bad influence on Cunningham's five children, whom Petitioner considered his step-children. (*Id.*) He wanted Sargent to stay away

from the house, and Sargent refused.  (*Id.* at 63.)  Sargent threatened Petitioner.  (*Id.*)  According to

Petitioner, Sargent told him that he was going to "have to eat bullets."  (*Id.* at 67.)

Petitioner then headed downtown, stopping at a friend's house briefly and eventually

ending up at his girlfriend's house.  Shortly thereafter, he went to the Hackley Liquor Store to get

a beer.  (*Id.* at 63-64.)  After he parked the car, he saw Sargent's car and caught a glimpse of Sargent

entering the store.  (*Id.* at 64.)  Petitioner went into the store and walked up to Sargent at the counter.

Petitioner confronted Sargent about his threat to shoot Petitioner, and Sargent laughed it off.  He then

asked Sargent to step outside, because he wanted to yell at him.  (*Id.* at 65-66.)  Sargent  said,

"[W]hat you want to talk about, the same shit . . . [?]"  (*Id.* at 66.)  Sargent was reluctant, so

Petitioner pushed him out of the store.  (*Id.*)  Petitioner testified that he believed that Asmonte Black

had given Sargent a gun after he overheard Sargent threaten Petitioner on Wood Street.  (*Id.* at 67.)

 Petitioner asked Sargent, "[W]hat's up with this gun thing, you gonna shoot me?"  (*Id.*)  Sargent

started laughing at Petitioner, and Petitioner punched him.  When Sargent fell down after the first

punch, Petitioner punched him again a couple of times.  When Sargent's eyes started to close,

Petitioner stepped back.  He then patted Petitioner's pockets, finding only a long set of keys and a

cell phone, but no gun.  Petitioner walked away.  (*Id.* at 67.)  Petitioner terstified that he may have

actually put his hand in Sargent's right pocket, but it was only to make sure what he was feeling was

not a gun.  (*Id.* at 68.)

Petitioner testified that he was angry with Sargent at the time of the incident and that

it was not the first time the two of them had fought.  (*Id.*)  His intention when he hit Sargent was to

"Kick his butt."  (*Id.* at 69.)  He never intended to seriously injure Sargent, and when he learned of

the injury, he was "upset and worried and bothered."  (*Id.*)  Petitioner tried to call Sargent as soon

- 14 -

as he learned that Sargent's jaw was broken, but Sargent did not answer him until the following Saturday. Petitioner told Sargent that he was sorry that he had broken Sargent's jaw, and he offered to pay for any medical treatment. Sargent told him not to worry about it. (*Id.* at 70.)

Marie Parker testified that Petitioner was her younger brother. (*Id.* at 86-87.) Mrs. Parker testified that she also knew Sargent, who was her cousin. (*Id.* at 87.) She learned of the incident late Thursday night, and she drove from Detroit to Muskegon on Friday morning. (*Id.* at 88, 90.) She went to see Sargent, who complained that he was missing an earring. Sargent did not mention having lost money. (*Id.* at 88-89) According to Mrs. Parker, Petitioner and Sargent had had problems in the past, but they got along fine. In fact, when she spoke to Sargent, he said, "I thought we were better than that." (*Id.* at 88.)

Michael Mosley testified that he was the cousin of both Petitioner and Sargent. (*Id.* at 93.) Mosley talked with Sargent after the incident. Sargent complained that he had lost his earring, but he did not mention money. (*Id.* at 94.)

Dr. Marc Ydenberg testified that he was the emergency-room physician who treated Sargent. (*Id.* at 102-03.) He also was shown the videotape from the party store. (*Id.* at 104.) Based on his experience as an emergency room physician, Sargent suffered a significant concussion as the result of the blows to his head. (*Id.* at 106-07.) According to Ydenberg, if a person wished to cause serious injury to another in a fight, he would aim his blows at the head. (*Id.* at 107.)

At the conclusion of trial, on January 8, 2009, the jury found Petitioner guilty of assault with intent to commit great bodily harm less than murder and unarmed robbery. (Tr. III at 3, docket #21.) On April 12, 2009, Petitioner was sentenced, as a fourth felony offender, to a prison term of 15 to 25 years on the unarmed-robbery conviction and 9 to 25 years on the assault

- 15 -

conviction, with jail credit of 245 days.  The court also imposed restitution in the amount of $201,833.06, together with statutory costs.  (Sentencing Transcript, (S. Tr.) at 36-37, docket #18.)

On July 29, 2009, court-appointed appellate counsel filed a motion for new trial raising a series of issues:  (1) trial counsel was ineffective in failing to investigate and subpoena various witnesses who could have testified that Darin Sargent had money in his pocket after the beating, which would have undermined Petitioner's conviction for unarmed robbery; (2) prosecutorial misconduct in pressuring Cunningham to testify that there was no money in Sargent's pocket after she helped him, based on an affidavit from Cunningham.  At oral argument on the motion held August 31, 2009, counsel requested an evidentiary hearing on both matters.  (*See* 8/31/09 Mot. for New Trial Tr., docket #22.)  Following oral argument, the trial court denied the motion for new trial on both grounds.  (*Id.* at 14-18.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on September 30, 2009, raised seven issues.  (*See* Def.-Appellant's Br. on Appeal, docket #23.)   Petitioner filed a pro per supplemental brief on October 21, 2009, in which he raised fourteen additional and overlapping issues.  In a lengthy, unpublished opinion issued on September 21, 2010, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 9/21/10 Mich. Ct. App. Opinion (MCOA Op.), docket #23.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised twenty grounds for relief, including all but one (ground seven in his supplemental brief) of the claims raised before and rejected by the Michigan Court of Appeals.

Petitioner was granted leave to amend his application, in which he further developed his first issue. By order entered May 24, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #24.)

<u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  The Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme

Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth by the Supreme Court, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–406). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    Unconstitutional Amendment of Indictment

In his first ground for habeas relief, Petitioner contends that the prosecutor added the unarmed robbery charge at the end of the preliminary examination, without notice, preventing Petitioner from contesting the charge at the preliminary examination.  He asserts that the late amendment violated state law and deprived him of due process.

To the extent that Petitioner challenges the propriety of the amendment under state law, his claim is not cognizable on habeas review.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  As a consequence, Petitioner's objections under state procedural rules are not properly before this Court.

Moreover, Plaintiff's federal claim is without merit.  The Supreme Court has determined that, while an arrestee is entitled to a proceeding to establish probable cause for his arrest or detention, his conviction cannot be vacated on habeas review on the ground of his preliminary

proceeding was defective.  *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975); *see also Sanders v. Detroit Police Dep't*, 490 F. App'x 771, 773-74 (6th Cir 2012).  Instead, prior to trial, a state criminal defendant has a due process right to be informed of the nature of the accusations against him.  *See Lucas v. O'Dea*, 179 F.3d 412, 417 (6th Cir. 1999).  Notice and opportunity to defend against criminal charges as guaranteed by the Sixth Amendment to the United States Constitution are an integral part of the due process protected by the Fourteenth Amendment and therefore apply to state prosecutions.  *See Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *In Re Oliver*, 333 U.S. 257, 273 (1948).  "The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense."  *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988).

Here, Petitioner does not contest that he had ample notice and opportunity to defend against the criminal charges.  Petitioner received notice of the additional charge at the end of the preliminary examination on July 2, 2008.  His trial did not start until six months later, on January 6, 2009.  Because he had notice and an opportunity to defend the unarmed-robbery charge, he suffered no constitutional deprivation.

## II.    Right of Self-Representation

In his second ground for habeas relief, Petitioner contends that he was denied his Sixth Amendment right to represent himself.  As discussed earlier in this opinion, Petitioner was represented by retained counsel prior to his preliminary examination.  He then rejected his attorney and represented himself at the preliminary examination on July 2, 2008.  Petitioner subsequently was appointed a public defender on July 25, 2008, but he engaged a retained attorney four days later, on July 29, 2008.  This retained attorney moved to withdraw on September 30, 2008, because of a

breakdown in the attorney-client relationship.  Petitioner supported the motion, and it was granted

and the attorney was allowed to withdraw on October 2, 2008, two weeks prior to the scheduled trial.

Petitioner expressed his desire to postpone trial in order to engage Steven Corwin.  Corwin was

retained on October 20, 2008.  Consistent with his prior pattern, less than two months after hiring

Corwin as his fourth attorney, Petitioner wrote a letter to the trial court in December 2008, discussing

a conflict that he was having with his attorney about trial strategy, preparation, and the filing of

certain motions.  Shortly thereafter, on December 16, 2008, counsel moved to withdraw because of

a breakdown in the attorney-client relationship.

On December 22, 2008, two weeks before the rescheduled trial date, the court held

a hearing on counsel's motion to withdraw and Petitioner's request to discharge his fourth attorney.

(12/22/08 Hr'g on Mot. to Withdraw, docket #16.)  Petitioner was placed under oath, and the court

engaged in a lengthy colloquy:

> THE COURT:  You want me to grant the motion?
>
> MR. PARKER:  **(indistinguishable)** few variables.  This case is a lot
> different than my attorney is leadin' it out to be.  If I can –
>
> THE COURT:  Don't – as you know, everything you're saying is being
> recorded, so be careful what you say.
>
> MR. PARKER:  Yes.  That's another point that I want to make.  There's
> really in my case is out in the open.  There's no strategy to it.  It's just whatever I say
> avenues that – that's contrary to what I'm – all I want to just say what the evidence
> is, say what happened, say what took place, everything is, how it happened.  There's
> no strategy to it.  It's just whatever I say I can live with that.  And my attorney wishes
> to pursue avenues that – that's contrary to what I'm – all I want to just say what the
> evidence is, say what happened, say what took place, everything is, how it happened.
> There's no strategy to it.  It's just outright, you know, let's put everything on the table
> and that's the way it is.  My attorney thinks different.  He wants to do different
> techniques and do – I'm against it.  My attorney I expressed to him – before I hired
> him he came to see me in a meeting and we talked for 30 minutes and I expressed to

him that the reason I was firing Mr. Swanson is he would not file motions. He asked me this, why are you gettin' rid of your other attorney. I told him because I have a few motions that I would like the Court to know about; I would like to address a few issues before the Court to check out, you know what is illegal and the process and whatnot. He told me OK when I get on the case I do this. He promised me he would do it. I had my family to pay him and when he came I expressed the same thing. He came two, three more visits which was probably 10 minutes apiece. And I said why you steady coming to see me and discuss, you know, discuss something for 10 minutes and then leavin'. We ain't gettin' nothin' done. We can't – he say well I like to build up to it. I say well I would prefer if you just come one time sit down with me for 2, 2½ hours really go through all the aspects of this case so we could be ready as opposed to three or four visits of 10 minutes here, 10 minutes there, 10 minutes there and nothing's getting done. You know, that was the conflict we having so –

. . .

So that's the problem and so I'm having a problem with that and I asked him to file the motions. I discussed with –

THE COURT: Mr. Parker let me – before you finish up you're not entitled to the assistance of a standby attorney and since we already have had a public defender appointed who's been excused I won't be appointing a new public defender for you. So you'd have to do it by yourself. You understand that?

MR. PARKER: Yes.

THE COURT: You'd have street clothes but it'd just be you sitting at the table all by yourself with your notebooks and legal pads and things like that.

MR. PARKER: I understand that your honor **and it's not my wish** – **I don't know where Mr. Corwin is coming from as far as laying my wish to argue my case or argue my trial. No it's my wish to have an attorney. That's why I have my people to time after time hire a retainer counsel. That's my wish.** But if my attorney is not here to pursue avenues that I'm paying him to pursue then what's the purpose of paying him? I don't understand that. And I mean if they're not legitimate grounds let the Court look at them and say well the motions are frivolous. I don't understand what it's not. If I read off my motions – if I'm able to get the Court a copy of my motions to look over you can see that they're not just frivolous reckless motions being filed to distract the Court a prolonged trial. I want to be at trial on the 6th of January when I'm supposed to be at trial. If that's without him so be it. I don't need no extra time. I'm ready. I been studying my case. I'm ready.

- 22 -

. . .

THE COURT:  OK, thank you.  Well gentlemen, let me touch a couple of bases here.  Mr. Parker's waiver of his right to counsel as he's identified just a few minutes ago clearly does not satisfy the standards of <u>People [v] Anderson</u>, 398 Mich 361.  And so at this point the Court would not find him to have waived that right and to allow him to represent himself.

The other issue though is separate and must be considered that way.  Mr. Parker started with Mr. Fisher representing him at the preliminary examination.  That representation ceased at the defendant's request.  Mr. Parker then represented himself for a little while.  At the pretrial here he was granted a new public defender, Mr. Wilson.  Later on Mr. Swanson came into the case as retained cuonsel and the Court granted a motion to withdraw filed by Mr. Swanson.  So Mr. Corwin, by my count is the third or fourth attorney who's appeared in the file. . . . The trial is a short distance away.  Granting the motion now creates a host of problems.  It impacts this case.  It affects other cases.  It affects witness memory and everything else.  The Court is also mindful of the fact that before the Court can allow Mr. Parker to represent himself the Court has to find that it will not unduly disrupt or inconvenience the Court.  And that's from <u>Anderson</u> as well.  And clearly Mr. Parker's been through the system a couple of times.  He knows a lot.  I've had experience with him.  But I think to allow the changeover now disrupts the schedule.  It may create a disruption in the trial schedule although Mr. Parker says he's ready to go.  And finally I'm not satisfied that the reasons for allowing Mr. Corwin to withdraw are valid here frankly, at least from Mr. Parker's end.  Frankly I believe that Mr. Parker is creating these kinds of conflicts.  He knows how to work the system and he's trying to manipulate the system again.

So I know Mr. Corwin you're in a difficult spot.  What we have done occasionally in cases like this is you're still the attorney, you're calling the shots here, but we have occasionally allowed the attorney to submit an in pro per motion over your heading with your caption that says we want the Court to consider this and the Court's considered some of those that way.  That leaves you in charge but while still allowing the defendant a chance to present his arguments to the Court.  It's not the preferred system but in difficult cases like this we've occasionally allowed that.

So the motion is denied.  We'll see you all on the sixth.  Thank you.

(*Id.* at 5-13 (emphasis added).)

The Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that a criminal defendant shall have the right to the assistance

of counsel in his defense.  *See* U.S. Const. amend. VI; *see also Faretta v. California*, 422 U.S. 806, 832-34 (1975)*; Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 154 (2000).  This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself. *Faretta*, 422 U.S. at 832-34; *see also United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987) ("'The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'") (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)).  "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so."  *Faretta*, 422 U.S. at 817.

Given the importance of the right to counsel, however, a defendant's request for self-representation must be unequivocal and his waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent.  *See Faretta*, 422 U.S. at 834-35; *Johnson v. Zerbst,* 304 U.S. 458, 464-65 (1938).  For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"  *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)); *see also Iowa v. Tovar*, 541 U.S. 77, 88-89 (2004).  Whether a defendant's choice was made with "eyes open" generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *Zerbst,* 304 U.S. at 464-65.  The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct

litany for warning defendants against waiving the right to counsel."[3]  *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005).  However, less rigorous warnings are required before trial than at trial "because, at that stage, 'the full dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'"  *Tovar*, 541 U.S. at 90 (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

However, the Supreme Court has recognized that the right to self-representation "'is not absolute.'"  *Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (holding that in the context of prior issues of mental competency may permit a state to limit the right of self-representation) (quoting *Martinez*, 528 U.S. at 162).  As the *Faretta* Court itself observed, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom." 422 U.S. at 834 n.46 (internal quotation omitted).  "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.  *Martinez*, 528 U.S. at 162 (holding that the right of self-representation does not apply on direct appeal in a criminal case).  For example, courts may require that a defendant make his request to represent himself in a timely fashion.  *Id.*  In addition, a court may appoint standby counsel even without the express consent of the defendant.  *Id.*  Nevertheless, a court is not required to appoint standby counsel or permit "hybrid" representation.  *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  Further, the trial judge need not provide personal instruction on procedure or otherwise assist the defendant.  *Id.* (citing *McKaskle*,

---

[3]The Court notes that the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in *1 Bench Book for United States District Judges* 1:02-2 (3d ed. 1986) before accepting a waiver of a right to an attorney.  *King v. Bobby,* 433 F.3d 483, 492 (6th Cir. 2006); *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987).  However, this type of formal, detailed inquiry is not required by clear Supreme Court precedent.  *King,* 433 F.3d at 492. Accordingly, in the context of federal habeas review, there is no script that a state court must follow in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel.  *Id.* Rather, the state court must reasonably apply Supreme Court precedent, which requires looking at the "whole record" to determine if the defendant made a knowing and intelligent waiver.  *Id.*

465 U.S. at 183-84). Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. *Faretta*, 422 U.S. at 834 n.46 (citing *Illinois v. Allen*, 397 U.S. 337, 342 (1970) (holding that a defendant's right to confront witnesses may be overcome by the defendant's engagement in disruptive conduct)).

Finally, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle*, 465 U.S. at 177 n.8; *see also Washington v. Renico*, 455 F.3d 722, 734 (6th Cir. 2006) (holding that "denial of the *Faretta* right is a structural error for which [defendant] need not show any prejudice") (citing *McKaskle*, 465 U.S. at 177 n.8).

The Michigan Court of Appeals carefully analyzed the case under *People v. Williams*, 683 N.W.2d 597, 602 (Mich. 2004):

> In *Williams*, *id.* at 642-643, the Court explained the requisite procedure when a defendant desires to represent himself, as outlined in *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976) and MCR 6.005(D):
>
>> [A] trial court must make three findings before granting a defendant's waiver request. First, the waiver request must be unequivocal. Second, the trial court must be satisfied that the waiver is knowingly, intelligently, and voluntarily made. To this end, the trial court should inform the defendant of potential risks. Third, the trial court must be satisfied that the defendant will not disrupt, unduly inconvenience, and burden the court or the administration of court business.
>>
>> It prohibits a court from granting a defendant's waiver request without first "advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation . . . . [MCR 6.005(D)(1).]" [Alteration and omission in original.]

Every reasonable presumption against a waiver must be indulged. *Russell*, 471 Mich at 188.

In this case, the trial court did not clearly err in finding that defendant failed to unequivocally waive his right to counsel. Although defendant informed the trial court in a written letter that he wanted to represent himself, when questioned on the record before trial, he expressed a desire for counsel. He informed the trial court that it was "my wish to have an attorney." Defendant explained that his principal dissatisfaction with his attorney was that counsel was unwilling to file certain motions that defendant wanted to file. The trial court responded to that concern by permitting defense counsel to submit pro se motions to allow defendant a chance to present his arguments to the court. Because the record demonstrates that defendant did not unequivocally waive his right to counsel, the trial court did not err by denying defendant's request for self-representation.

(MCOA Op. at 3.) Although the court of appeals' decision relied solely on Michigan cases, the cited cases relied upon the United States Supreme Court's decisions in *Faretta*, 422 U.S. at 835, and *Tovar*, 541 U.S. at 88.

The state appellate court properly determined that Petitioner's invocation of his right to represent himself was not unequivocal. At the hearing, Petitioner never squarely stated that he wanted to represent himself. In fact, he indicated that he would prefer to have an attorney represent him, if he could get his motions heard. Such language bars a conclusion that Petitioner's invocation was unequivocal.

Petitioner argues, however, that the transcript does not fully capture his invocation of his right. He contends that the "indistinguishable" reference in the hearing transcript was really his unqualified response of "Yes," to the judge's question about whether Petitioner wanted him to grant counsel's motion to withdraw. (12/22/08 Hr'g on Mot. to Withdraw, docket #16 at 5.) Petitioner's argument lacks credibility. The words immediately following the "indistinguishable" notation are "few variables." The word "Yes" makes no sense as the immediate predecessor to the

- 27 -

words "few variables."   Moreover, Petitioner's mere recitation of the word "Yes" would be insufficient to make his invocation of the right unequivocal.   The word precedes Petitioner's lengthy explanation of his concerns and his subsequent clear statement that he would prefer to be represented by a lawyer:

> I don't know where Mr. Corwin is coming from as far as laying my wish to argue my case or argue my trial.   No it's my wish to have an attorney.   That's why I have my people to time after time hire a retainer counsel.   That's my wish.

(12/22/08 Hr'g on Mot. to Withdraw, docket #16 at 8.)   The testimony is inherently contradictory, making any invocation of the right to represent himself equivocal.

Petitioner next argues that his statement that he preferred to be represented by counsel was merely an expression of his desire in an ideal world, and that he meant to invoke his right to represent himself.   Essentially, Petitioner disputes the Michigan Court of Appeals' interpretation of his statements.   As previously discussed, a state court's factual determination is entitled to a presumption of correctness, which may be overcome only by clear and convincing evidence.   *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656; *Sumner*, 449 U.S. at 546 (applying presumption to findings of appellate courts).   Plaintiff's interpretive suggestions fall far short of being clear or convincing.

In sum, both the trial court and the court of appeals reasonably determined that Petitioner had not unequivocally invoked his right to represent himself.   Petitioner therefore fails to demonstrate a Sixth Amendment violation.

- 28 -

III.   Ineffective Assistance of Trial Counsel

In Grounds III, IX, X, XI, XII, and XV of his habeas application, Petitioner contends that his trial attorney rendered ineffective assistance in a variety of circumstances.[4]  In Ground III, Petitioner argues that counsel failed to prepare for trial by interviewing witnesses and failed to sufficiently explain the sentencing guidelines.  In Ground IX, Petitioner asserts that counsel was ineffective when he failed to object to the victim's clear hearsay testimony that he had heard that Petitioner had robbed him, and he thereby deprived Petitioner of his rights under the Confrontation Clause.  In Ground X, Petitioner claims that counsel was ineffective in failing to file certain pro per motions prior to trial.  In Ground XI, Petitioner contends that trial counsel rendered ineffective assistance when he failed to investigate the existence of pending criminal charges against certain prosecution witnesses and failed to impeach the credibility of those witnesses by using their criminal records.  In addition, in Ground XII, Petitioner argues that counsel was ineffective in failing to impeach the victim's testimony that he may have watched Ms. Cunningham's children once or twice, despite having documentation that the victim had been paid by the state for years to provide daily child care to those children.  Finally, in Ground XV, Petitioner claims that counsel was ineffective because he operated under a conflict of interest arising out of his friendship with the judge.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient

---

[4]Petitioner also argues in Ground IX that trial counsel was ineffective in failing to object to a violation of Petitioner's right of confrontation when the victim testified that he had heard that Petitioner had robbed him.  The Court will address the confrontation issue, including the lack of objection, separately.

performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficult of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

### A.      Failure to Interview Witnesses

In Ground III, Plaintiff alleges that he provided counsel with a list of witnesses and their contact information, but counsel first lost the information and then, after receiving another copy of the list, failed to interview the witnesses until the day of trial.   Plaintiff also complains that, had counsel interviewed Ms. Parker, he would have discovered that she had both called and visited the police station.   Plaintiff contends that Ms. Parker could have given testimony to contradict the prosecutor's suggestion during closing argument that she had recently fabricated her testimony because she had never called and told the police about her conversation with the victim, in which he never claimed to have lost money.

While citing Michigan cases, the court of appeals applied the *Strickland* standard to Plaintiff's claims regarding the failure to investigate or present evidence:

> Defense counsel has wide discretion with respect to matters of trial strategy. *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007).  "[A] defendant must overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances."  *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).  This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight.  *Unger*, 278 Mich App at 242-243.  "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy . . . ."  *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).  The failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).  A substantial defense is one that might have made a difference in the trial's outcome.  *Chapo*, 283 Mich App at 371.
>
> . . .
>
> Defendant argues through appellate counsel that trial counsel was ineffective for failing to interview and present the testimony of various witnesses who would have testified that when they spoke to the victim after the assault, he did not mention that he was missing his money. On the first day of trial, the parties discussed whether

the trial court would allow a parade of defendant's family members to present such testimony. Defense counsel later proposed that he would like to call two witnesses on that subject, which the trial court permitted. Later, defense counsel called the two witnesses, each of whom testified that when they spoke to the victim after the assault, he did not mention any missing money. Thus, the record clearly establishes that defense counsel's decision regarding which witnesses to call on this subject was a matter of trial strategy. Further, because defendant was permitted to call the two witnesses, the failure to call additional witnesses to testify regarding the same subject matter did not deprive defendant of a substantial defense. Therefore, defendant's argument lacks merit.

(MCOA Op. at 9-10.)

The court of appeals' determination was patently reasonable. Defense counsel called two witnesses, Marie Parker and Michael Mosley, both of whom cast doubt on the victim's claim of missing money. The trial court twice advised defense counsel that it would not permit five witnesses about conflicting prior statements made by the victim, citing MICH. R. EVID. 613, which limits the admission of extrinsic evidence to show prior inconsistent statements of a witness. (Tr. I at 27, Tr. II at 6.) In these circumstances, it is apparent that counsel's decision to call the witnesses he did was the result of trial strategy. Petitioner identifies no facts supporting his claim that the witnesses, who were relatives and friends of Petitioner, would have provided superior evidence to those called by defense counsel. He therefore wholly fails to overcome the strong presumption that counsel's strategy was sound and that his performance was competent. *See Strickland*, 466 U.S. at 688-89.

Moreover, Petitioner cannot demonstrate the requisite prejudice. Petitioner does not identify which witnesses defense counsel failed to call or what those witnesses would have said. Indeed, at the hearing on the motion for new trial, appellate counsel acknowledged that none of the listed witnesses – all of whom she had written and some of whom she also attempted to call – had

- 32 -

contacted her or provided her with any information.  (*See* Mot. for New Trial Hr'g Tr., docket #22 at 5-6.)  In the absence of information about the testimony counsel failed to produce, Petitioner cannot demonstrate that the testimony would have had an effect on the judgment.  *Strickland*, 466 U.S. at 689.

Finally, Petitioner's argument concerning the failure to interview Ms. Parker is equally unsupported.  Petitioner argues that counsel should have known that the prosecutor would make a closing argument challenging Ms. Parker's failure to advise the police earlier about her conversations with the victim, and he should have been prepared to ask Parker if she had spoken with the police.  Petitioner states that Ms. Parker called the police and went to the police station with the victim and spoke with an officer.  Yet he fails even to allege, much less show, that Ms. Parker told the police that the victim had not mentioned the theft when she spoke with him.  In fact, Petitioner makes no representations, even by way of argument, about what Ms. Parker told the police.

In the absence of factual support, Petitioner cannot demonstrate that Ms. Parker, if asked by defense counsel, could have testified that she told the police about her conversation with the victim.  As a consequence, he fails to demonstrate either that counsel performance was deficient or that Petitioner was prejudiced.

In sum, Petitioner cannot demonstrate either prong of the deferential *Strickland* standard, much less overcome the double deference accorded the state-court's disposition of his claim.

- 33 -

## B.      Failure to Explain Sentencing Guidelines

Also in Ground III, Petitioner complains that defense counsel was ineffective in explaining the sentencing guidelines. Prior to trial, Petitioner was offered a *Cobbs* agreement, with a minimum sentence of not more than 108 months. At that time, the sentencing guidelines range for the minimum sentence was estimated to be 43 months to 172 months. Following trial, with a higher than estimated scoring of two variables (Offense Variable (OV) 3 and OV 8), Petitioner's guidelines range increased to 50 to 200 months. Petitioner actually was sentenced to a minimum of 180 months. Petitioner contends that he did not understand that the guidelines range could change. Petitioner asserts that, had he known, he "may well have accepted the plea deal offered . . . ." (Br. in Supp. of Pet., docket #2, Page ID#56.)

The state court rejected Petitioner's claim:

> Defendant also argues through appellate counsel that defense counsel was ineffective for failing to adequately explain the sentencing guidelines and the scoring of the guideline variables, so as to enable defendant to make an informed decision whether to accept the trial court's *Cobbs* commitment. The record indicates that the trial court allowed defendant to confer with defense counsel to decide whether to accept the court's *Cobbs* commitment, but it does not indicate the substance of counsel's advice. Therefore, defendant has failed to establish the factual predicate for this claim that counsel's advice was deficient. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Further, the record indicates that the trial court specifically asked defendant if he understood how the sentencing guidelines worked, noting that defendant had been to prison before, and defendant stated that he understood them. Thus, the record does not factually support defendant's claim that he was unable to make an informed decision whether to accept the trial court's *Cobbs* offer. Accordingly, this ineffective assistance of counsel claim cannot succeed.

(MCOA Op. at 11.) The court's determination was patently reasonable. The trial court expressly advised Petitioner that the sentencing guidelines range was an estimated one. The court gave Petitioner time to speak with counsel about the plea. In addition, the trial court, while

acknowledging that Petitioner was an experienced defendant, asked if Petitioner fully understood the guidelines, and Petitioner agreed he did. As a consequence, the state court's determination that Petitioner had failed to prove the performance prong of *Strickland*, especially in light of the double deference owed on habeas review, constituted a reasonable application of Supreme Court precedent.

Moreover, Petitioner fails to demonstrate the requisite prejudice under *Strickland*. In *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), the Supreme Court held that, in a claim alleging that counsel was ineffective in advising a defendant about a plea offer, the *Strickland* standard continues to apply. In the context of a guilty plea, the prejudice prong of *Strickland* depends on whether, absent counsel's errors, the result of the plea process would have been different. *See Lafler*, 132 S. Ct. at 1385-87; *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). In such circumstances, "defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012). The *Lafler* Court thoroughly rejected the argument that a subsequent fair trial renders counsel's earlier ineffective assistance irrelevant. 132 S. Ct. at 1387.

Petitioner fails to show that, absent a difference in counsel's performance, the result would have been different. He does not claim that, had he known that the guidelines range could be increased, he *would* have pleaded guilty. Instead, he merely states that he *might* have accepted the plea agreement and pleaded guilty. Such a representation falls far short of establishing a reasonable probability that the result of the plea process would have been different. Petitioner therefore fails to overcome the presumption that counsel's performance did not deprive Petitioner of a fair trial.

- 35 -

### C.      Failure to Object to Hearsay

Petitioner asserts that trial counsel was ineffective in failing to object to the victim's testimony that unidentified others told him that Petitioner had robbed him.  Petitioner contends that counsel's failure to object to the testimony violated his rights under the Confrontation Clause.

The Michigan Court of Appeals gave short shrift to Petitioner's claim:

> Defendant argues in his Standard 4 brief that defense counsel was ineffective for failing to object to the victim's testimony that the only way he knew that defendant had robbed him was because other people had told him. Defendant argues that this testimony was inadmissible hearsay. It is apparent that defense counsel's intent in eliciting the testimony was to ensure that the jury knew that the victim did not see defendant take his money. Counsel's strategy was not objectively unreasonable. Therefore, defendant has failed to show that he was denied the effective assistance of counsel.

(MCOA Op. at 10.)

The court of appeals' decision was patently reasonable.  Although defense counsel certainly could have objected to Sargent's statement, he instead elected to challenge Sargent's credibility by emphasizing the many inconsistencies in Sargent's testimony, Sargent's belated claim to have lost money, his obvious lack of knowledge about Petitioner's conduct, and his equivocation about the reasons for Petitioner's conduct.  As the court of appeals held, counsel's decision clearly was strategic.  Petitioner falls far short of overcoming the double deference owed to the state court's resolution of this claim.

### D.      Failures Raised in Supplemental Brief on Appeal

In Ground X, Petitioner contends that trial counsel was ineffective in failing to file all of the pro per motions Petitioner wanted filed, despite having been permitted to file them by the trial court.  The only motion he discusses in Ground X, however, is his motion seeking discovery

of the victim's toxicology report.  In Ground XI, Petitioner asserts that counsel was ineffective in failing to investigate certain prosecution witnesses about their pending criminal charges and subsequently failing to impeach them with the information.  In Ground XII, Petitioner argues that defense counsel failed to impeach the victim's testimony that he had only watched Cunningham's children a couple of times with information that the victim had been paid by the state to watch Cunningham's children for two years.  In Ground XV, Petitioner claims that defense counsel rendered ineffective assistance because he had a conflict of interest and bias in favor of the prosecution and the judge because of past employment and personal relationships.

The Michigan Court of Appeals summarily rejected the four claims because Petitioner had failed to develop a factual record to support his claims:

> Defendant raises four additional ineffective assistance of counsel claims, none of which are supported by the record.  He contends that defense counsel was ineffective for (1) failing to file a discovery motion for the victim's toxicology report, (2) failing to investigate two prosecution witnesses' criminal histories, (3) failing to use state agency documentation to impeach the victim, and (4) failing to provide effective assistance due to a conflict of interest and bias in favor of the prosecutor and the trial judge.  All of these matters are dependent upon facts outside the record for which defendant has failed to provide supporting proof. Because defendant has not established the factual predicate for these claims, they cannot succeed.  *Hoag*, 460 Mich at 6.

(MCOA Op. at 11-12.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state

court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

Here, the court of appeals unquestionably rejected Petitioner's claims because he had failed to follow a state-court procedure rule that required him to develop the factual record to support his claims of ineffective assistance of counsel.  The court's determination that Petitioner failed to follow an adequate and independent state procedural rule unquestionably was proper.  Appellate counsel moved for a new trial on a variety of grounds, including some claims of ineffective assistance of counsel.  She sought an evidentiary hearing on those grounds.  Petitioner, however, never sought an evidentiary hearing on his supplemental claims, either from the trial court or the court of appeals.  Because Petitioner's claims do not depend on facts available in the trial record, no question exists that Petitioner failed to develop the facts sufficient to support his supplemental claims of ineffective assistance.  He therefore failed to follow the state procedural rule relied upon by the state court.

Further, no question exists that the state procedural rule applied by the court of appeals was adequate and independent. A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural

default.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411,

423-24 (1991)).  The Michigan Supreme Court long has held that

> [a] convicted person who attacks the adequacy of the representation he received at
> his trial must prove his claim.  To the extent his claim depends on facts not of record,
> it is incumbent on him to make a testimonial record at the trial court level in
> connection with a motion for a new trial which evidentially supports his claim and
> which excludes hypotheses consistent with the view that his trial lawyer represented
> him adequately.

*People v. Hoag*, 594 N.W.2d 57, 59 (Mich. 1999) (quoting *People v. Ginther*, 212 N.W.2d 922, 925

(1973)).  Moreover, although there may be an "exceptional case in which exorbitant application of

a generally sound rule renders the state ground inadequate to stop consideration of a federal

question," *see Lee v. Kemna*, 534 U.S. 362, 376 (2002), this case does not fall within that "limited

category."  *Id.*

Petitioner therefore unquestionably has defaulted his supplemental claims of

ineffective assistance of counsel because he did not develop the necessary factual record to support

the claims.  If a petitioner procedurally defaulted his federal claim in state court, the petitioner must

demonstrate either (1) cause for his failure to comply with the state procedural rule and actual

prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal

habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547

U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The

miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts

a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas

petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is

more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner has not even attempted to demonstrate cause excusing his default. Although the ineffective assistance of appellate counsel may serve as cause excusing a failure to raise a claim of ineffective assistance of trial counsel, that claim itself must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Petitioner has never attempted to raise a claim of ineffective assistance of appellate counsel.  Appellate counsel's performance therefore cannot be relied upon to excuse his procedural default.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner also has not attempted to demonstrate his actual innocence within the meaning of *Schlup*, 513 U.S. at 327.  Although Petitioner continues to dispute his intent in striking the victim, he does not present any new evidence, much less evidence making it more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt.  *Id.*

As a result, Petitioner's four supplemental claims of ineffective assistance of counsel set forth in Grounds X, XI, XII, and XV are procedurally barred.

IV.   Confrontation

In his fourth ground for habeas relief, Petitioner argues that the trial court improperly precluded him from cross-examining Sargent about Sargent's involvement with drugs, thereby depriving Petitioner of his constitutional right under the Confrontation Clause to fully present a defense and establish Sargent's bias.  Petitioner contends that Sargent was under the influence of

- 40 -

drugs at the time of the assault, which may have prevented him from remembering events as they actually occurred.  He also contends that the evidence was necessary to show Petitioner's motive in striking Sargent.

On direct appeal, Petitioner contended that the trial court's decision to exclude the mention of drugs violated the Michigan Rules of Evidence and the Confrontation Clause.  The Michigan Court of Appeals addressed the federal issue as follows:

> Defendant argues through appellate counsel that the trial court improperly precluded him from cross-examining the victim regarding his involvement with drugs, which also affected his constitutional right of confrontation. We review defendant's preserved evidentiary issue to determine whether the trial court abused its discretion by limiting the scope of defendant's crossexamination.  *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008).  An abuse of discretion occurs when the trial court's decision falls outside the principled range of outcomes. *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008).  However, because defendant did not raise his constitutional argument in the trial court, we review that unpreserved issue for plain error affecting defendant's substantial rights. *Hanks*, 276 Mich App at 92.
>
> . . .
>
> [T]he trial court's ruling did not affect defendant's constitutional right of confrontation.  Although a defendant has a constitutional right to confront the witnesses against him, that right is not without limits.  *People v Ho*, 231 Mich App 178, 189-190; 585 NW2d 357 (1998).  A trial court may impose reasonable limits on a defendant's cross-examination based on concerns about prejudice, confusion of the issues, witness harassment, or questioning that is irrelevant or only marginally relevant. *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993).  Here, the trial court did not foreclose defendant's right to challenge the victim's credibility, but merely limited it regarding one issue, which was justified under the circumstances.  Thus, there was no plain error.

(MCOA Op. at 4-5.[5])

---

[5]As is apparent from the quoted excerpt from the opinion, the court of appeals found that Petitioner had limited his objection in the lower court to the state-law evidentiary question.  It therefore applied only plain-error review. Arguably, therefore, Petitioner's confrontation claim is procedurally defaulted.  However, because it is simpler to address the merits of the issue than to address the question of procedural default, I will skip the procedural-default analysis. *See See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

To the extent Petitioner claims that the trial court's decision violated Michigan law or the Michigan Rules of Evidence, such claims are not cognizable for purposes of federal habeas corpus review.   The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.   Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman*, 268 F.3d at 439; *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

As to his constitutional challenge, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted).  The Sixth Circuit recently explained:

> [A] "meaningful opportunity" is not "every opportunity," and relevant evidence is frequently excluded from trial. Trial judges must make "dozens, sometimes hundreds" of evidentiary decisions throughout the course of a typical case, and rarely are these of constitutional significance: "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive

> . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90, 106 S. Ct. 2142 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)) (alterations and omissions in original). But while the Constitution leaves much in the hands of the trial judge, "an essential component of procedural fairness is an opportunity to be heard." *Id.* at 690, 106 S. Ct. 2142.

*Gagne v. Booker*, 596 F.3d 335, 340-41 (6th Cir. 2010). A proper inquiry into the constitutionality of a trial court's decision to exclude evidence begins with considering the relevance and cumulative nature of the excluded evidence, and the extent to which it was "central" or "indispensable" to the defense. *Id.* at 341. Against this, courts must balance the state's interests in enforcing the evidentiary rule on which the exclusion was based. *Id.*

Petitioner contends that he should have been permitted to fully explore the reasons for his altercation with Sargent: that he was concerned about Sargent being around Cunninghams' children because of Sargent's involvement in drugs. The court of appeals reasonably concluded that the trial court had properly attempted to avoid a mini-trial on whether Sargent was involved in drugs and the extent to which he was involved. Sargent's use of drugs was merely the reason for Petitioner's concern about Sargent's association with Cunningham. Although Petitioner was prohibited from talking about Sargent's use or sales of drugs, Sargent was thoroughly questioned about whether Petitioner might have been concerned that Sargent was involved with Petitioner's former girlfriend. Petitioner therefore was not entirely precluded from presenting a reason for his assault on Sargent. In fact, after equivocation, Sargent acknowledged that Petitioner probably was concerned about his relationship to Cunningham, and Sargent admitted that he had made a prior statement to that effect. (Tr. I at 184-85.) In addition, Petitioner himself testified that he was concerned that Sargent was a bad influence on Cunningham's five children, whom Petitioner

considered to be his own.  (Tr. II at 62-63.)  Further, as the both the trial and appellate courts recognized, the reason for Petitioner's conduct was not central to his guilt on the offense; Petitioner's reasons could not serve to excuse his violent assault.  Under these circumstances, the state courts' limitation on cross-examination constituted a reasonable application of Supreme Court precedent.

V.     <u>Prosecutorial Misconduct</u>

Petitioner complains that the prosecutor engaged in a variety of misconduct, in violation of Petitioner's right to due process.  In Ground V of  his habeas application, Petitioner contends that the prosecutor denigrated the defense during his closing argument, by stating that the defense was trying to trick the jury.  In Ground VII, Petitioner argues that, based on a post-trial affidavit, the prosecutor committed misconduct by pressuring a witness to testify in support of the government's case.  In addition, in Ground VIII, Petitioner asserts that the prosecutor violated his rights by repeatedly telling the jury that Petitioner could have told the police his story earlier, but he did not do so.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12

- 44 -

(1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

### A.    Denigration of the Defense

Petitioner complains that the prosecutor repeatedly denigrated the defense during rebuttal argument by suggesting that defense counsel had engaged in "old defense attorney tricks" and had attempted to "flim flam" the jury by suggesting that they should believe that Petitioner had not intended the greater offense because he admitted that he had engaged in a lesser offense.  (Tr. II at 143, 145-46.)  The Michigan Court of Appeals addressed Petitioner's first claim of prosecutorial misconduct as follows:

> The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial.  *People v Brown*, 279 Mich App 116; 134; 755 NW2d 664 (2008).  "Prosecutorial  comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial."  *Id.* at 135.

> Defendant argues that the prosecutor improperly suggested that defense counsel attempted to mislead the jury by referring to his defense strategy as "tricks."  Viewed in context, it is apparent that the prosecutor was responding to defense counsel's statements asking the jury to find defendant guilty of simple assault because defendant admitted committing that crime.  Although the prosecutor referred to this defense strategy as a trick, the prosecutor asked the jury to find defendant guilty of the more serious offense based on the evidence.  Because the prosecutor's argument was not focused solely on defense counsel, and instead was directed at the evidence, there was no plain error.  *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003); *People v Kennebrew*, 220 Mich App 601, 607-608; 560 NW 2d 354 (1996); *Unger*, 278 Mich App at 236-237.  Further, to the extent that the prosecutor's remarks can be considered improper, a timely objection and request for a curative instruction could have eliminated any prejudice.  Thus, reversal is not warranted. Id. at 235.

(MCOA Op. at 5.)

- 45 -

The state-court's determination was an entirely reasonable application of established Supreme Court precedent.  A prosecutor is free to argue from the evidence that certain defense witnesses are lying, but may not denigrate the defense or defense counsel.  *See Hanna v. Price*, 245 F. App'x 538, 545-46 (6th Cir. 2007); *Bates v. Bell*, 457 F.3d 501, 525 (6th Cir. 2006).  Not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict.  *See United States v. Young*, 470 U.S. 1, 11 (1985) (stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial").  "A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992); *see also Brown v. McKee*, 231 F. App'x 469, 480 (6th Cir. 2007) (a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel).

Here, while using the words "tricks" and "flim flam," the prosecutor proceeded to analyze the evidence to explain why jurors should not accept the defense argument that Petitioner only intended to commit a lesser offense.  (Tr. II at 143, 145-46.).  In such circumstances, the arguments were not improper.  *August*, 984 F.2d at 715.

Moreover, even had the prosecutor's comments been improper, they were not flagrant enough to justify habeas relief.  *See Henley v. Cason*, 154 F. App'x 445, 447 (6th Cir. 2005). The prosecutor's comments were not so incendiary so as to inflame the jury's passion or distract them from determining petitioner's guilt or innocence.  *See Davis v. Burt*, 100 F. App'x 340, 348 (6th Cir.

2004). When combined with the instruction from the trial judge that the attorney's arguments, questions, and statements were not evidence, the prosecutor's comments did not render the entire trial fundamentally unfair. *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000).

## B. Coercion of a Witness

In Ground VII, Petitioner argues that the prosecutor impermissibly coerced Carma Cunningham into giving testimony that was favorable to the government. "The Supreme Court has long recognized that due process is denied where '[the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.'" *Brooks v. Tennessee*, 626 F. 3d 878, 894 (6th Cir. 2010) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Deliberate deception is "incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972). Government misconduct that amounts to substantial interference with a witness's free and unhampered determination to testify may be deemed a violation of due process. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997). Such misconduct amounting to witness intimidation will not justify a new trial, however, unless the defendant demonstrates that it was not harmless. *Id.*; *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007); *United States v. Roach*, 502 F.2d 425, 437 (6th Cir. 2007).

The court of appeals rejected Petitioner's claim on appeal:

Defendant also moved for a new trial on the ground that the prosecutor improperly coerced the testimony of Carma Cunningham, causing her to provide false and misleading testimony. The motion was supported by Cunningham's affidavit. Cunningham averred that she "was sure" that the victim had money in his pocket after defendant's assault and told that to the prosecutor. She asserted that the prosecutor told her to "forget about" what she knew and suggested that she may have stolen the money herself. According to Cunningham, the prosecutor also reminded

her in a threatening way that she was due to be sentenced in an unrelated criminal matter and told her that his office could recommend a jail term, probation, or even request reinstatement of an original felony charge, depending on whether her testimony in this case helped or hurt the prosecution.  Cunningham stated that pressure from the prosecutor combined with her anger toward defendant resulted in her biased, reluctant, and misleading testimony.  Defendant requested an evidentiary hearing, but the trial court denied his motion without holding an evidentiary hearing.

A new trial may be granted because of misconduct.  *See* MCR 2.611(A)(1)(b).  Prosecutor intimidation used to coerce a witness to testify or change his or her testimony amounts to a denial of a defendant's due process rights.  *See People v Hill*, 257 Mich App 126, 135; 667 NW2d 78 (2003).  A new trial is appropriate if the intimidation resulted in a defendant being denied a fair and impartial trial.  *Id.*  Also, a prosecutor may not knowingly use false testimony to obtain a conviction.  *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009).  A defendant is entitled to a new trial if there is a reasonable likelihood that false testimony could have affected the judgment of the jury.  Id.

We decline to remand the case for an evidentiary hearing.  Assuming that Cunningham would have testified consistent with her affidavit, we are confident that the jury would not have acquitted defendant of the unarmed robbery charge.  We reach this conclusion given the victim's testimony about the disappearance of his money from his pocket, the testimony from witnesses that defendant reached into the victim's pockets after the assault, the surveillance video showing defendant reaching into the victim's pockets and then looking into his cupped hand, the testimony of a witness who assisted the victim after defendant's departure who stated that he saw no one picking money up off the ground or reaching into the victim's pockets, and given the bias that likely would have been attributed to Cunningham's testimony, considering her five-year relationship with defendant.

(MCOA Op. at 12-13.)

The court of appeals properly applied the Supreme Court's standard for reviewing prosecutorial misconduct.  The court held that, assuming Cunningham's testimony to be true, the evidence harmless.  As previously discussed, that determination is entitled to deference.  Given Cunningham's long-term relationship to Petitioner, Cunningham's testimony in support of Petitioner likely would have been viewed with skepticism.  In light of the videotape evidence that captured

Petitioner's search of Sargent's pockets and the evidence from other witnesses, the state court did not act unreasonably in concluding that Cunningham's proposed testimony was harmless.

In addition, the trial court, in denying the motion for new trial, thoroughly explored the facts both at trial and in the Cunningham's affidavit, and it expressly found that the affidavit was not credible in the context of the factual record:

> [MS. OWENS (defense attorney on appeal)]:  Now with regard to the allegation of prosecutorial misconduct, Carma Cunningham has given an affidavit saying that Mr. Hilson, both implicitly and expressly, told her and exerted pressure on her to testify that there was no money in Mr. Sargent's pocket after she helped him up and helped him get to the hospital.

> This affidavit came to me in the mail from Ms. Cunningham.  I called her after I received it to speak to her about all of the allegations, but she did say that there was money in his pocket.  That much she did confirm to me.  And let me see if I can have a note of my conversation with her.

> . . .

> MS. OWENS:  Darin S. did have money in his pocket.  That is what Carma Cunningham –

> THE COURT:  Does your note say that whether she felt that herself.  Like when she was searching for the keys, that she felt the money in his pocket?

> MS. OWENS:  She did not.  She did not say that.

> THE COURT:  So she did not divulge to you the facts upon which she based that conclusion?

> MS. OWENS:  No, she didn't.  In any event, as I say, if her affidavit is credited, then it's very likely that there was improper pressure exerted on her to testify one way or the other.  And for that reason, we've requested an evidentiary hearing.  Thank you.

> THE COURT:  Ms. Owens, before you sit down, and if you need to look, that's fine, but I carefully re-read Ms. Cunningham's testimony.  And I didn't see in Mr. Hilson's direct examination of her where he asked her about money in the pocket.

- 49 -

MS. OWENS:  You know, I re-read that myself, your Honor.  And it's true. I have to agree with you.  He never did ask her that.  The issue whether or not there was anything in the pocket and whether she went in the pocket seemed to have brought up [sic] more extensively by Mr. Corwin [defense counsel].

THE COURT:  By Mr. Corwin.

MS. OWENS:  So I have to agree with you on that.  Mr. Hilson did not bring that up.

THE COURT:  So you're probably anticipating my next question then.  If this is so important to Mr. Hilson that he's risking his professional reputation, he's risking certainly new trial motions, he's risking even his standing with the State Bar of Michigan, doesn't it seem weird that he never – or at least incongruous that he didn't ask her that question?

MS. OWENS:  I agree, it would be incongruous.  The only argument that I could come up with is that perhaps Ms. Cunningham felt some sort of a need to please him, and she was trying to give him what she thought he wanted in order to get light on her own – get some air on her own case.  She was, perhaps, afraid on her own criminal case.

. . .

MS. OWENS:  I did not – My reading of her testimony is the same as yours. I agree.

THE COURT:  And Mr. Corwin asked her specifically twice, two fully leading questions about that.  And that was the time for her to say, yes, there was money; or no money was missing; or, yes, there was money, and she didn't say that either time.

MS. OWENS:  She was evasive.

THE COURT:  And it would seem . . . . As I read it . . . [o]n page 36 . . . of jury trial, day two of three, line 19.  Do you recall coming across some cash in his pocket?  You know, it's cross-examination, so it's not inappropriate, but it's a fairly leading question.  And her response was, evasive, and didn't really say, yes, there was.  And it struck me that then right below that, on line 24, he said, right, but you do recall him having money.  Another fairly leading question where she could have said, yes, I recall, and she didn't really respond to that.

- 50 -

So to follow through then, if Mr. Corwin was expecting a better answer from her, wouldn't that have been the time for him to say, Ms. Cunningham, when I talked to you last night, or the night before, didn't you tell me – in other words, to impeach her with a prior inconsistent statement that she gave him.  And he didn't do that. Now maybe that feeds into your other argument that he should have been better prepared for her testimony, and maybe he didn't interview her.  I don't know.

. . .

THE COURT:  All right.  Thank you.  Two motions here – two bases, I guess I should say.

. . .

The recantation issue.  It's based upon the affidavit of fact signed by Carma Cunningham, that was not prepared by Ms. Owens.  In the affidavit, Ms. Cunningham concedes that she was the ex-girlfriend of the defendant.  And she says, essentially, that Mr. Hilson [the prosecutor] coerced her into providing false testimony.  Paragraph seven says this.  "As a result, I was mislead [sic] into believing this intended threat, and thus persuaded by fear to forget about the fact that I seen money."  "I was then reminded in a threatening way that his office was set to sentence me in two weeks on an unrelated matter."

So if I look at paragraph seven, I was mislead into believing this intended threat and persuaded by fear to forget, thus analyzed, it's a fairly weak ground to support such a motion here.

My other concerns are flagged by the questions that I asked Ms. Owens.  If Mr. Hilson was so determined to get this testimony in that he would risk his professional reputation and sanctioning by the appropriate authorities, it seems rather puzzling that he didn't ask her that question in his direct examination.  He did not do that.  And it also seems puzzling to me that when reacting to a favorable question, Mr. Corwin, the attorney for her ex-boyfriend, when he teed it up and gave here every opportunity to say what she now says she wanted to say, that she declined to do that. He then, as I noted, didn't follow up with anything with her, like, well, didn't you tell me this, in a way that would suggest that she had something different to offer.

Mr. Justian outlines cases in his brief that I'm not going to mention that talked about the skepticism with which recantation testimony needs to be viewed. And this effort falls way, way short of that standard.  So the motion is denied on that basis as well.

(Mot. for New Trial Tr. at 7-10, 14, 16-18.)

- 51 -

The trial court's analysis of Cunningham's affidavit was both thoughtful and entirely rational.  The Court determined that an evidentiary hearing was not required because the affidavit was inconsistent with, not only Cunningham's testimony at trial, but also the entire context of her examination at trial. As the trial court recognized, recantation by a victim who testified at trial is universally viewed with suspicion by reviewing courts.  *See Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J., dissenting from denial of *certiorari*) ("Recantation testimony is properly viewed with great suspicion."); *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (recognizing that even sworn affidavits recanting trial testimony are viewed with "extreme suspicion"); *Matthews v. Ishee*, 486 F.3d 883, 895-96 (6th Cir. 2007) (same).  Moreover, Cunningham's allegations about the prosecutor lacked all credibility in light of the prosecutor's failure even to ask for the testimony he ostensibly intimidated Cunningham into giving.

In sum, the state courts reasonably concluded both that Cunningham's affidavit was wholly insufficient to demonstrate either that the prosecutor had engaged in misconduct and or that Petitioner was prejudiced in any way.

### C.    Commenting on Petitioner's Right to Silence

Petitioner contends that the prosecutor violated his right to due process by questioning and commenting about Petitioner's failure to tell his story to the police.  During cross-examination of Petitioner, the prosecutor asked Petitioner why he had not told the investigating detective about Sargent's gun and about Sargent's earlier threats. (Tr. II at 80-81.) Similarly, the prosecutor induced Detective Clark's testimony that, after being given *Miranda* warnings and initially denying knowing why he was being questioned, Petitioner answered a number of questions before asking to see the

police report prior to answering more.  (Tr. II at 42-44.)   In closing argument, the prosecutor

emphasized that Petitioner had not provided his version of the incident.  (*Id.* at 125.)

The court of appeals rejected Petitioner's claim as follows:

> We also disagree with defendant's pro se argument that the prosecutor's questioning and comments violated his right to silence.  Where a defendant decides to speak and waive his Miranda rights, anything he says, or does not say, is admissible until he invokes his right to silence.  *People v McReavy*, 436 Mich 197, 217-218; 462 NW2d 1 (1990); see also *People v Shafier*, 483 Mich 205, 212-215; 768 NW2d 305 (2009) (a defendant's silence following arrest and decision to remain silent following the giving of *Miranda* warnings cannot be used against the defendant).  In this case, the prosecutor's questions were based on defendant's refusal to divulge information during police questioning related to the assault, after defendant was advised of and had waived his *Miranda*[2] rights.  Defendant at no point invoked his right to remain silent.  See *Berghuis v Thompkins*, __ US __; 130 S Ct 2250, 2260; __ L Ed 2d __ (2010) (a defendant must unambiguously invoke the right to remain silent by affirmatively expressing the desire to remain silent or to not talk to the police). In this circumstance, the prosecutor's questioning was not improper.  Further, because the questions were not improper, the prosecutor was free to comment on this subject during closing argument.  *Unger*, 278 Mich App at 236.  Thus, there was no plain error.

> 2 *Miranda v. Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

(MCOA Op. at 5-6.)

The state-court's decision constituted a reasonable application of established Supreme

Court precedent.  The Fifth Amendment of the United States Constitution provides that no person

"shall be compelled in any criminal case to be a witness against himself."   In order to prevent

coercive custodial interrogations designed to undermine the Fifth Amendment, the Supreme Court

held in *Miranda v. Arizona*, 384 U.S. 436 (1966) that, when an individual is in custody, law

enforcement officials must warn the suspect before his interrogation begins of his right to remain

silent, that any statement may be used against him, and that he has the right to retained or appointed

counsel. *Id.* at 478-79.  Under *Miranda*, evidence of a defendant's custodial statement may only be introduced as evidence of guilt at trial if the defendant was first given such warnings.  *Id.* at 479.

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court considered whether a defendant's silence during a custodial interrogation could be used, not as evidence of guilt, but to impeach the defendant's testimony at trial.  The Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  The theory underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings."  *Id.* at 618.  On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial.  *Id.*

However, "[t]he Doyle rule does not . . . apply to the prosecutor's statements when the defendant waived his right to silence after being read the *Miranda* warnings."  *United States v. Lawson*, 476 F. App'x 644, 650 (citing *United States v. Crowder*, 719 F.2d 166, 172 (6th Cir. 1983) (en banc) ("[T]he Doyle rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the Miranda warnings."). Where, as here, a suspect has elected to speak after being given his *Miranda* warnings, his statements and silences may be used against him unless he clearly and unequivocally invokes his right to silence.  *See Berghuis v. Thompkins*, 560 U.S. 370, 385-87 (2010); *see also Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam) ("[A] defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent").  The court of appeals expressly relied

upon *Berghuis v. Thompkins* in denying Petitioner's claim. That reliance constituted a reasonable application of established Supreme Court precedent.

VI.   <u>Sentenced on Inaccurate Information</u>

In his sixth habeas ground, Petitioner argues that he was denied his right to due process when he was sentenced on inaccurate information. He claims that the sentencing court improperly scored Offense Variable (OV) 8, which added 15 points for asportation because Petitioner had pushed the victim out of the store to a less-safe place in the street.

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987). As a state-law matter, both the trial court and the court of appeals found that the facts supported a finding of asportation under the OV 8. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

Although state law errors generally are not reviewable in a federal habeas proceeding, a sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988) (citing *Tucker*, 404 U.S. at 447).  A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 447.

In the instant case, Petitioner does not identify any fact relied upon by the court at sentencing that was materially false, nor does he identify a conclusion based on false information. *Tucker*, 404 U.S. at 447.  Instead, Petitioner simply argues that the court should have reached a different conclusion about whether the largely undisputed facts met the definition of asportation under Michigan sentencing law.  He therefore entirely fails to demonstrate a due-process violation. The state-court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of established Supreme Court precedent.  28 U.S.C. § 2254(d).

VII.   Allowing Children to Be Present at Trial

In his thirteenth ground for habeas relief, Petitioner contends that his right to due process was violated when the trial court permitted a class of fifth-grade students to sit in the courtroom during the jury trial while graphic photos were shown.  Petitioner argues that the children had subtle reactions to the photos, which captured the attention of the jury on several occasions.

The court of appeals concluded that the issue was procedurally barred:

Defendant argues in his Standard 4 brief that he was prejudiced when the trial court allowed an elementary school class to observe a portion of the trial during which the victim's doctor testified regarding the victim's injuries. Defendant contends that he was prejudiced because the jury was unduly influenced by the children's emotional reactions to the evidence and testimony. Defendant did not object to the children's presence at trial or otherwise raise this issue in the trial court. Therefore, it is not preserved and our review is limited to plain error affecting defendant's substantial rights. *Hanks*, 276 Mich App at 92. Because it is not apparent from the record that the children reacted inappropriately or that the jury was likely to be influenced by any reaction, a plain error has not been shown.

(MCOA Op. at 6.)

As I previously discussed, when a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst*, 501 U.S. at 801. To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks,* 377 F.3d at 551. The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See*

- 57 -

*Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010).  Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or actual innocence.  *House*, 547 U.S. at 536; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

Petitioner makes no attempt to argue cause excusing his default.  Indeed, despite his numerous claims of ineffective assistance of counsel, Petitioner does not attempt to argue that counsel was ineffective for failing to object.  Moreover, any such argument would itself be defaulted, as Petitioner never argued in the state court that counsel was ineffective for failing to object.  To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted.  *Edwards*, 529 U.S. at 453; *Buell*, 274 F.3d at 349.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  In addition, Petitioner has neither claimed nor shown by newly discovered evidence that he is actually innocent of the offense.

For all these reasons, Petitioner's claim is procedurally defaulted.

VIII.    Access to the Courts

In Ground XIV of his habeas application, Petitioner argues that he was deprived of his right to access the courts when he was denied access to legal research materials while he was awaiting trial.  Petitioner contends that, as a result, he was prevented from adequately preparing for trial and from effectively helping with his defense.

The court of appeals addressed the issue as follows:

Defendant argues in his Standard 4 brief that he was denied his constitutional right to aid in his own defense because he was denied access to the jail law library. Because defendant did not raise this issue below, it is unpreserved and our review is

- 58 -

limited to plain error affecting his substantial rights. *Hanks*, 276 Mich App at 92. Defendant was represented by counsel at trial. Therefore, the state was under no constitutional obligation to provide defendant with access to a law library. *People v Yeoman*, 218 Mich App 406, 415; 554 NW2d 577 (1996). It is the mere offering of competent legal assistance that satisfies the Sixth and Fourteenth Amendments. *People v Mack*, 190 Mich App 7, 24; 475 NW2d 830 (1991). Thus, there was no constitutional violation and, accordingly, no plain error.

(MCOA Op. at 4.)

The state-court squarely held that Petitioner had failed to preserve his claim by raising it in the trial court. His claim therefore is procedurally defaulted. As previously discussed, procedural default ordinarily will bar federal review. *See Magwood v. Patterson*, 561 U.S. 320 (2010). However, the Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson*, 351 F.3d at 216 (citing *Lambrix*, 520 U.S. at 525. I therefore will proceed directly to the merits of Petitioner's access-to-the-courts claim.

The Supreme Court has never recognized the right of a defendant who is represented by counsel to have access to a law library. For that reason alone, Petitioner cannot show that the state-court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent. Moreover, the Sixth Circuit repeatedly has recognized that, once counsel has been provided for a defendant, the state has fulfilled its constitutional obligation to provide access to the courts. *See Martucci v. Johnson*, 944 F.2d 291, 295 (6th Cir. 1991); *Holt v. Pitts*, 702 F.2d 639, 640–41 (6th Cir. 1983). Because Petitioner was represented by an attorney at all times, the denial of law library privileges did not impair his rights to due process or access to the courts. *United States v. Manthey*, 92 F. App'x 291, 297 (6th Cir. 2004); *United States v. Smith*, 907 F.2d 42, 44 (6th Cir. 1990).

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  December 15, 2014                          /s/ Ellen S. Carmody_____
                                                  ELLEN S. CARMODY
                                                  United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).